STATE of Minnesota, Respondent,

v.

Earl WEMBLEY, Appellant.

No. A05–245.

Court of Appeals of Minnesota.

April 25, 2006.

Mike Hatch, Attorney General, St. Paul, MN; and Amy Klobuchar, Hennepin County Attorney, David C. Brown, Assistant County Attorney, Minneapolis, MN, for respondent.

John M. Stuart, State Public Defender, Marie L. Wolf, Assistant Public Defender, Minneapolis, MN, for appellant.

Considered and decided by
SHUMAKER, Presiding Judge;
LANSING, Judge; and HALBROOKS,
Judge.

## OPINION

SHUMAKER, Judge.

Appellant challenges his conviction for criminal sexual conduct, arguing that (1) his constitutional right to confrontation was violated; (2) the district court made several errors in its evidentiary rulings; and (3) his counsel was ineffective. Appellant also raises in his pro se brief a separate issue of ineffective assistance of counsel and argues that the evidence was tainted. Because we find no reversible error, we affirm.

## FACTS

Appellant Earl Wembley was convicted of criminal sexual conduct against his 12–year–old daughter.

M.C. had two daughters by Wembley, L.C. and K.C. Wembley, M.C., and the girls lived together for a time, but then M.C. and the girls moved to another residence. Thereafter, both girls occasionally visited Wembley.

In May 2004, when K.C. was 12 years old, she stayed at Wembley's apartment for a weekend. L.C. did not accompany her on this visit. After that visit, K.C. told L.C. and M.C. that Wembley rubbed her body with lotion, made her watch a pornographic videotape, and sexually touched and penetrated her.

M.C. called the police, and Detective Kent Nielsen investigated. He took K.C. to CornerHouse, a child-advocacy agency, for a forensic interview; arranged for a medical examination; arrested and interviewed Wembley; and searched Wembley's apartment, where he located the pornographic videotape that K.C. alleged that she watched.

The state charged Wembley with criminal sexual conduct, and he opted for a jury trial. K.C. testified, as did Detective Nielsen and Jodi Lashley, an expert forensic interviewer employed by CornerHouse. K.C.'s interview was videotaped, and the tape was received in evidence as a trial exhibit. During its deliberations, the jury was allowed to view a replaying of the videotaped interview.

The jury found Wembley guilty, and he brings this appeal, alleging constitutional and evidentiary errors and ineffective assistance of counsel.

## ISSUES

1. Is a defendant in a criminal case entitled to be present while the jury, dur-

ing its deliberations, reviews a videotaped statement that was admitted into evidence as an exhibit?

2. Even though an expert witness impermissibly testifies to the credibility of an alleged crime victim, is the testimony unfairly prejudicial when all of the expert's "assessment criteria" are factors that the jury could observe and discern without expert assistance?

3. When a party offers his own out-of-court statement in his favor and fails to identify a relevant nonhearsay purpose for the statement, may the district court assume that the statement is offered for its truth unless a nonhearsay purpose is otherwise apparent from the nature or content of the statement or its context?

4. Did the district court err in excluding as irrelevant evidence that someone other than the appellant allegedly sexually abused the victim's sister?

5. Was appellant's defense counsel ineffective when she failed to object to expert testimony and other evidence, failed to present certain witnesses to testify, and allegedly failed to investigate the allegations against appellant?

## ANALYSIS

1. *Wembley's Absence During Videotape Replay*

■ Shortly after the jury retired to deliberate, it sent a note to the court requesting the videotape of K.C.'s Corner-House interview. At the court's direction, the jury returned to the courtroom, and, in the presence of the prosecutor, defense counsel, and Wembley, the court told the jury that the videotape would be played in its entirety in the courtroom and that only the bailiff and the court's clerk would be present. Wembley did not object to this procedure. The court, counsel, and Wembley left the courtroom, and the jury viewed the entire videotape a single time.

Wembley claims for the first time on appeal that the district court committed reversible error by allowing a replaying of the videotape in his absence and without his waiver of his right to be present at a critical stage of the trial.

■ Because Wembley did not object to the court's procedure for reviewing the videotape, he is presumed to have waived any alleged error in that procedure. *See State v. Gustafson*, 610 N.W.2d 314, 318 (Minn.2000). Nevertheless, we may consider whether the procedure constituted plain error that affected Wembley's substantial rights. *State v. Litzau*, 650 N.W.2d 177, 182 (Minn.2002). The threshold inquiry in a plain-error analysis is whether the district court in fact erred in a ruling at trial. *See id.* Caselaw has applied Minn. R.Crim. P. 26.03, subd. 19(1) and (2)—regarding materials that may be taken to the jury room and requests by the jury to review evidence—to the issue of replaying videotaped statements after the jury retires to deliberate. *State v. Kraushaar*, 470 N.W.2d 509, 514 (Minn. 1991). And caselaw recognizes that the district court has broad discretion in applying that rule. *Id.* Here, if the district court abused its discretion by improperly applying rule 26.03, subd. 19, in light of pertinent caselaw, through the procedure the court used for replaying the videotape, then there was error.

Wembley presupposes that the *jury's reviewing* of the videotape after deliberations had begun was a critical stage of the trial. He cites various cases holding that, after a jury retires to deliberate, communications between judge and jury, requests by the jury to have certain testimony read, questions by the jury, and instructions by the court to the jury are all critical stages of the trial at which a criminal defendant is entitled to be present and as to which he is entitled to be heard. We agree, but there

are three crucial distinctions between Wembley's authorities and the proceedings at issue.

First, the videotape of K.C.'s statement was not testimony. It was not under oath. *See* Minn.Stat. § 595.01 (2004) (to be a "witness," a person must give declarations under oath); Minn. R. Evid. 603 (before testifying, a witness must, by oath or affirmation, declare to testify truthfully). Nor was the statement adversarial in the sense that it was subject to cross-examination at the time of its making. And the statement was not subject to any of the rules of the adversarial system. *See, e.g.,* Minn. R. Evid 611(c) (regulating the use of leading questions). A principal authority that Wembley cites and quotes is a case from New Jersey that discusses the concerns about the use of "videotaped testimony." *State v. Michaels,* 264 N.J.Super. 579, 625 A.2d 489, 523 (1993), *aff'd,* 136 N.J. 299, 642 A.2d 1372 (1994). Not having the essential underlying oath or affirmation, and bereft of other procedural restrictions and safeguards of the adversary system, K.C.'s statement could not be classified as competent testimony except solely in rhetoric. Her statement, in interview form, is more accurately characterized as investigative, and thus the rules and cases dealing with the rereading of trial testimony do not apply.

Second, K.C.'s CornerHouse statement, as recorded, was offered and received, without objection, as an *exhibit* at trial. Rule 26.03, subd. 19(1), provides that the "court *shall* permit the jury, upon retiring for deliberation, to take to the jury room *exhibits which have been received in evidence* ... except depositions...." (Emphasis added.) The mandate "shall" in the rule implicitly confers on the jury a right to have the use of exhibits that have been received in evidence. This is precisely what the supreme court indicated when it considered the question of whether a de-

liberating jury in a kidnapping trial was entitled to view videotapes that had been received in evidence of the defendant assaulting and engaging in discussions with his victims: "In analyzing this problem, it is necessary to keep in mind that the *jury had a right to view the video tapes* since they had been received into evidence." *State v. Ming Sen Shiue,* 326 N.W.2d 648, 653 (Minn.1982) (emphasis added). On the face of rule 26.03, subd. 19(1), Wembley's jury had a right to view the exhibit consisting of K.C.'s recorded CornerHouse statement.

But the supreme court has been reluctant to read the rule as an absolute right, stating that, when applying the rule to videotapes, "trial courts should exercise caution and discretion." *Kraushaar,* 470 N.W.2d at 515. The supreme court further indicated that the rule does not mean that the district court has "unreviewable discretion" in allowing the jury to use such exhibits. *Id.*

Wembley's concern is primarily that he was not allowed to be present *while the jury viewed the videotape.* That brings us to a third distinction, namely, between the proceedings the court employed preliminarily to the replaying of the tape and the actual playing of the tape for the jury. Wembley surely was entitled to know that the jury had requested a replaying of the tape; he was entitled to be heard as to whether the court would grant the request and, if it did, what procedure would be followed; and he was entitled to be present when the jury returned to the courtroom to hear the judge respond to the request and instruct the jury as to what procedure would be used. He was present for the entire preliminary proceedings, and nothing in the record suggests that he was denied an opportunity to object to the replaying of the tape or to be heard as to the procedure the court proposed to use in

the replaying. But bearing in mind that the videotape was an exhibit in the trial which the jury had a right to review to some extent, he was not entitled to be present while the jury performed its function of reviewing that item of evidence any more than he would be entitled to be present when the jury reviewed any other item of evidence. We know of no authority, and Wembley has cited none, that allows any party, or even the court, to supervise or monitor a jury's review of admitted evidence during its deliberations.

The sense of rule 26.03, subd. 19, in light of pertinent caselaw, is that the district court may reasonably regulate the manner and extent of the jury's use of a videotape exhibit, but it would be in clear contravention of the rule if no use of the exhibit were permitted at all. Thus, Wembley was not denied his right to be present at and to be heard about a critical stage of the trial.

■ Wembley also raises a concern about the presence of the bailiff and the judge's law clerk during the replaying of the video. Consistent with our conclusion that neither the parties nor the district court is entitled to be present when the jury engages in its function of reviewing evidence, court personnel should not be present either. Rule 26.03, subd. 19, does not adequately address the logistics of replaying a nontestimonial recorded statement. But it is inadvisable to have anyone other than jurors present while the jury performs its official function. The potential for extraneous influence from nonjurors exists when nonjurors mix with jurors during evidence review. Wembley has neither argued nor shown that the nonjurors present for the replaying of this tape influenced the jury in any way. And the court was cautious to limit the jury to a single viewing of the tape in its entirety and to instruct the jury to make no comment or engage in any discussion until it

returned to the jury room. Absent a comprehensive procedural rule providing for the jury's right to view the exhibit balanced against safeguards addressing concerns of misuse, undue prejudice, and avoidance of the potential for, or even the appearance of, extraneous influence, the court here selected a reasonable procedure, did not abuse its discretion, and did not commit error in excluding Wembley from the courtroom when the jury viewed the exhibit.

Because videotaped statements of children who allegedly have suffered sexual abuse have become commonplace in trials, and because rule 26.03, subd. 19, does not fully address the situation that arose here, some guidance for future trials might be helpful. At the threshold is the rule that the child-declarant's out-of-court statement is hearsay if it is offered to prove that what the child said was true. Minn. R. Evid. 801(c). But the statement is not hearsay if the child testifies at trial and is subject to cross-examination and if the statement is both consistent with the child's trial testimony and would be helpful in evaluating credibility. Minn. R. Evid. 801(d)(1)(B) This is the rule under which statements of the type produced at CornerHouse are ordinarily offered and received. Such statements, or pertinent portions thereof, may also be disclosed for impeachment if they are inconsistent with the child's testimony. Minn. R. Evid. 801(c).

So, there are proper bases for allowing the jury to hear such *statements*. The problematic issue arises when the *recording* is offered and received as an *exhibit* because that triggers the jury's right to view the recording during its deliberations. *Ming Sen Shiue*, 326 N.W.2d at 653. There are at least three approaches through which the *statement* may be allowed, if it qualifies under the Rules of

Evidence, but the videotape of the statement may be disallowed. First, the videotape of the statement is cumulative evidence. The jury will have heard the child's testimony at trial. It will then have heard the identical, or substantially similar, statement through the playing of the videotape during the trial. If the videotape is an *exhibit* in the case, the jury then is entitled to hear the same information a third time. The court may disallow the videotape *exhibit* as "needless presentation of cumulative evidence." Minn. R. Evid. 403.

The second approach for allowing the statement but excluding the recording as an exhibit is that the exhibit, when replayed during deliberations, tends to highlight and isolate one portion of the trial evidence, thus inviting, perhaps encouraging, undue emphasis on that portion. Under Minn. R. Evid. 403, the district court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. The probative value of information already presented twice to the jury during the trial would seem minimal and clearly substantially outweighed by the danger of unfair prejudice through overemphasis of the evidence contained in the videotape.

The third approach is an application of Minn. R. Evid. 611(a). That rule vests the court with "control over the *mode* . . . of . . . presenting evidence so as to . . . make the . . . presentation effective for the ascertainment of the truth." (Emphasis added.) The court may rely on this rule in deciding that the *statement* is admissible and may be played through the videotape during the trial but the videotape itself will not be received as an exhibit.

We recognize that there might be instances in which an objection relates to the audio or the visual aspect of the recorded statement and that the recording should be received as an exhibit to facilitate meaningful appellate review. But if, as here, there is no objection to the *statement* in audio-visual form, or if an objection relates to a matter for which the videotape itself need not be preserved for appellate review, courts should be cautious about receiving such videotapes as exhibits, keeping in mind the implications of doing so.

2. *Expert Testimony of CornerHouse Interviewer*

CornerHouse is a child-advocacy center that, among other things, conducts forensic interviews of children who allegedly have been sexually abused. Jodi Lashley is the training coordinator and an interview specialist at CornerHouse. She has a bachelor's degree in sociology, a master's degree in social work, and training and experience in conducting forensic interviews of children in alleged sex-abuse cases. She interviewed K.C., videotaped the interview, and testified at trial about the process and content of the interview. Wembley contends that it was error for the court to allow Lashley to give expert testimony as to K.C.'s credibility.

Drawing on her expertise, Lashley performed two functions respecting K.C.: First, she interviewed K.C., using her expert background and skill to attempt to ensure that the process and content of the interview would be appropriate for and meaningful to K.C., considering K.C.'s age and background. Second, she "assessed" the interview. Lashley testified that in making her "assessment" she evaluated four criteria: (1) content, that is, what the child is able to say about the sex-abuse allegation; (2) consistency, that is, whether the child is consistent in what she says and what she is able to illustrate through the use of anatomical dolls or diagrams; (3) context, that is, "peripheral details which are not just the core things that happen,"

such as "[s]ensory details, things they've heard or smelled or felt or saw perhaps while abuse was occurring"; and (4) affect, that is, the emotions the child displays during the interview, including considerations of reluctance, spontaneity, and body language. The "assessment" also includes an exploration of "the alternative hypothesis," that is, a consideration of whether someone else other than the alleged perpetrator committed the abuse.

The purpose of the assessment was to determine K.C.'s credibility, as revealed by Lashley's answer to the following question by the prosecutor on redirect examination:

Q. And so then when you assess [K.C.'s] interview, that's also what you did in that case; you simply looked at what [K.C.] told you on June 24th and made a credibility assessment of her statement?

A. That's correct.

 The fundamental rule is that "assessment of witness credibility is a jury function." *State v. Reese,* 692 N.W.2d 736, 741 (Minn.2005). "An expert witness may not testify as to the credibility of a specific witness, though the expert may be able to testify generally as to certain psychological or physiological conditions that may affect credibility, if such testimony is beyond the knowledge and experience of an average jury." *Id. See also State v. Ritt,* 599 N.W.2d 802, 812 (Minn.1999) (an expert may not testify as to the coercive effects of an interrogation on a particular defendant because that is a jury question); *State v. Koskela,* 536 N.W.2d 625, 629–30 (Minn. 1995) (an expert may describe the nature of schizoid-personality disorder in general, but whether the defendant fit the profile was a jury question); *State v. Saldana,* 324 N.W.2d 227, 231–32 (Minn.1982) (an expert opinion about a witness's capacity to perceive events invades the province of the jury to make credibility determinations).

The Minnesota Supreme Court has recognized that, in most criminal cases, the credibility of witnesses "is peculiarly within the competence of the jury, whose common experience affords sufficient basis for assessment of credibility." *State v. Myers,* 359 N.W.2d 604, 609–10 (Minn.1984). And although an expert's opinion might be helpful, it might also be unduly influential:

In most cases, even though an expert's testimony may arguably provide the jury with potentially useful information, the possibility that the jury may be unduly influenced by an expert's opinion mitigates against admission. Nor should the credibility of witnesses in criminal trials turn on the outcome of a battle among experts.

*Id.* at 610. The court in *Myers* further emphasized the problem with expert opinion as to credibility, stating that, "[a]s a general rule, however, we would reject expert opinion testimony regarding the truth or falsity of a witness' allegations about a crime, for the expert's status may lend an unwarranted stamp of scientific legitimacy to the allegations." *Id.* (quotation omitted). It is the unusual case in which expert opinion as to credibility is admissible. *Saldana,* 324 N.W.2d at 231.

With the fundamental rule and the foregoing explanations in mind, we turn to the question of whether Lashley's expert testimony violated the proscription against expert opinion on credibility to a sufficiently serious degree as to cause unfair prejudice to Wembley. We begin by noting that, given the clear Minnesota rule about expert opinion on credibility, it is a perilous course for an attorney in a criminal case to present an expert for the express purpose of testifying about the expert's assessment of a witness's credibility, and we strongly caution against such usage of expert testimony in future cases.

 Although there surely is no rule against a forensic interviewer in a child-

sex-abuse case forming an opinion about the credibility of the interviewed child, the general, and nearly unexcepted rule, is that the expert may not testify directly or indirectly to that opinion. Lashley did not expressly state her opinion that she found K.C. to be credible. She did not testify that K.C. was telling the truth when she alleged that Wembley sexually molested her, and Lashley did not say that there was no fabrication in K.C.'s statement. But she did explain the criteria she used for assessing K.C.'s credibility, and she testified (1) that K.C. was able to relate the major facts of the molestation incident, thus satisfying the "content" criterion; (2) that K.C. was able to correspond her verbal recounting of the incident with pointing to parts of her own body, portions of the diagrams used, and parts of the anatomical dolls, thus fulfilling the "consistency" criterion; (3) that K.C. was able to relate various sensory details indicative of having actually experienced the sensations she described, thus meeting the "context" criterion; and (4) that, although K.C. exhibited reticence about certain aspects of the incident, she spoke with sufficient spontaneity at other times to support the "affect" criterion. In essence, Lashley, as the forensic interviewer, testified that K.C.'s interview was consistent with all factors making up the credibility assessment. This testimony violated the prohibition against expert opinion as to a witness's credibility.

█ But the violation did not unfairly prejudice Wembley. The jury watched the videotape of K.C.'s interview. Lashley did not interpret the videotape for the jury, although she did testify about K.C.'s use of diagrams that was not visible on the tape. That testimony was descriptive of what K.C. pointed to and did not involve Lashley's opinion or evaluation.

Despite Lashley's expert testimony about the assessment criteria and K.C.'s satisfaction of the criteria, the jury could judge for itself all of the factors on which Lashley relied in making her assessment. From viewing the videotaped interview, the jury could determine the extent and depth of the content K.C. described. The jury could verify whether K.C. was consistent in her statement and in her connection of her verbal description to the diagrams, the dolls, and her own body. The jury could also decide whether the contextual details K.C. discussed rang sufficiently true to support an inference that K.C. actually experienced the events she described. Moreover, the jury could see and hear K.C. and could assess her affect and her body language. Finally, the jury was able to compare all of what they saw and heard in the videotaped interview with what they saw and heard as K.C. gave her testimony in court during the trial.

Distilled to its essence, Lashley's expert testimony provided the jury with very little that the jury could not ascertain independently from considering the nonexpert evidence introduced at trial. Lashley's contribution, other than having employed her expertise to conduct the forensic interview, was to suggest some commonplace factors that any layperson might think of without expert assistance to help in determining whether to believe a witness's statement about an occurrence. Lashley's suggestion standing alone does not appear to violate the general rule about expert opinion as to credibility because it contains no opinion about credibility but rather provides an orderly way the jury could use its common experience in deciding a relevant issue. We conclude that there was no plain error in allowing the expert testimony of Jodi Lashley.

3. *Cross–Examination of Detective Nielsen*

█ Apparently during either a bench or chambers conference that is not on the

record, defense counsel stated that she would cross-examine Detective Nielsen about statements Wembley made during his interrogation. The prosecutor said she would object. Later, on the record, defense counsel said she "wanted to ask Detective Nielsen whether or not Mr. Wembley told him where to find the tape" that K.C. had testified she viewed in Wembley's bedroom. The prosecutor's objection was that that statement would be self-serving and hearsay. The court agreed, stating, "Okay. And I have ruled that that is not admissible because it's self-serving hearsay."

Wembley challenges the court's ruling, arguing that (1) "self-serving" is not a proper basis for an objection or a judicial ruling excluding evidence and (2) his statement is not hearsay. In support of his argument, Wembley cites *State v. Bergeron*, 452 N.W.2d 918, 926 (Minn.1990), in which the supreme court noted that an objection that evidence is "self-serving" is not valid under the codified evidence rules and that "[t]he objection that testimony is 'self-serving' appears to be a variation on the objection that a defendant is incompetent to testify because of an 'interest' or 'bias' in the case. Simply put, this is not really a valid objection under the Minnesota or Federal Rules of Evidence." *Id.* (citation omitted).

The issue in *Bergeron* was entirely different from that raised here. The defendant was on trial for felony-murder, it being alleged that he stabbed a homeowner to death during an attempted burglary of the decedent's home. *Id.* at 919. The defendant testified in his own defense, and his attorney asked him if he intended to burglarize or to steal anything when he went to the decedent's home. *Id.* at 926. The state objected solely on the ground that the testimony would be "self-serving," and the court sustained the objection. *Id.*

On appeal, the supreme court noted that the common-law rule disqualifying criminal defendants from being competent witnesses because of their "self-interest" had been abolished by modern evidence law. *Id.* The objection as "self-serving" that the *Bergeron* court considered went to the issue of the competency of a criminal defendant to promote his own self-interest by testifying in his own defense. Because modern evidence law permits such "self-serving" testimony, the court ruled that the objection as it relates to competency is no longer valid. *Id.* The objection in *Bergeron* did not raise a hearsay issue, and, thus, that case does not support Wembley's first argument.

The court's ruling here was not merely that the evidence would be self-serving but rather would be "self-serving hearsay." And Wembley contends that the statement would not have been hearsay. He claims on appeal that he "wanted merely to correct the inference left by Nielsen's testimony: that the only way the police knew about the videotape was by seizing it pursuant to a search warrant." He contends that his statement thus would have been offered for a purpose other than the truth of its content and, as such, it was not hearsay.

We note preliminarily that he is mistaken in his suggestion that, without his statement, the jury would be left to infer that "the only way the police knew about the videotape" was through the search of Wembley's apartment. Detective Nielsen listened to K.C.'s CornerHouse interview, and he heard her tell the interviewer that Wembley made her watch a pornographic videotape while they were in the bedroom. The jurors heard K.C.'s testimony about the pornographic videotape at trial, and they heard her statement about it in the recorded CornerHouse interview. The jury also heard Detective Nielsen's testi-

mony that he observed the CornerHouse interview and that "[d]uring the statement given by [K.C.], she talked about a pornographic video being played during the incident. After seeing that and arresting Mr. Wembley, I wanted to try and obtain that video." It is clear from the testimony of K.C. and Detective Nielsen that the police were aware of the pornographic videotape before they interrogated Wembley. The jury could not reasonably have inferred that the only way the police knew of the videotape was through the search of the apartment.

But Wembley is correct that a statement is hearsay only if it is offered "to prove the truth of the matter asserted." Minn. R. Evid. 801(c). Conversely, if a statement is offered for some other relevant purpose, it cannot be classified as hearsay.

At trial, defense counsel did not inform the court of any relevant nonhearsay purpose for the introduction of Wembley's statement. She told the court only that she wanted to show that Wembley told Detective Nielsen where the videotape could be found. The nonhearsay purpose Wembley now urges on appeal is not readily apparent from defense counsel's explanation at trial of why she wanted to elicit the statement. And considering the tenuousness of the nonhearsay purpose raised on appeal, as noted in our discussion of the "inference" the statement allegedly would correct, it was reasonable for the court to conclude that the statement was going to be offered for its truth, namely, the location of the videotape. Thus, unless counsel identifies a relevant nonhearsay purpose for an out-of-court statement, or unless such a purpose is readily apparent from its nature, content, or context, it is proper for the court to treat the statement as being offered for its truth.

This was a statement by a party to the case. A statement by a party is not hearsay if it is offered against that party. Minn. R. Evid. 801(d)(2). But it retains its hearsay nature if it is offered in the party-declarant's favor. This statement, ostensibly to be offered to prove its truth, would favor Wembley and, therefore, would be inadmissible hearsay. Moreover, because the statement would be offered to serve Wembley's interests, it was not improper for the court to characterize it as self-serving hearsay. The court did not err in this evidentiary ruling.

### 4. Prior Sexual Abuse of K.C.'s Sister

■ K.C. and her sister, L.C., lived for a time with their mother, M.C., and Steve Jones, M.C.'s boyfriend. Allegedly, Jones sexually abused L.C., and L.C. told both M.C. and K.C. something about the abuse. Wembley's theory of defense as stated in his brief on appeal "was that [K.C.] had acquired sexual knowledge through prior sexual abuse of her sister, and possibly of herself, by Steve Jones." Wembley wanted to testify about a conversation he had with M.C. to illustrate that the abuse of L.C. had been a family topic of conversation and that "might have suggested itself to [M.C.] or [K.C.], or both" that they could get Wembley out of their lives by accusing him of sexually abusing K.C. The court ruled that the information Wembley sought to disclose was irrelevant and more prejudicial than probative. Wembley claims this ruling denied to him the opportunity to present a complete defense.

■ The district court has wide discretion in determining the relevancy of evidence. State v. Schulz, 691 N.W.2d 474, 477 (Minn.2005). The court permitted Wembley to cross-examine K.C. about what she learned from L.C. regarding the alleged sexual abuse of L.C. K.C. testified that she could not recall specifics because she was only three or four years old at the time. The district court did not restrict

Wembley's right of proper cross-examination of K.C. on this topic.

■ But the court did preclude Wembley from testifying that he wanted to discuss with M.C. the allegations against Jones so as to acquire more information from M.C. about the alleged sex abuse. It appears that Wembley wanted to testify about information he hoped to acquire from M.C. but that he did not acquire in a conversation with her. Evidence is relevant if it would make a fact of consequence more likely or less likely than it would be without the evidence. Minn. R. Evid. 401. Evidence that a party hopes to obtain but fails to obtain is not evidence of anything at all. And we know of no authority that would make relevant Wembley's desire for information so that he could assemble a defense. The court did not err in its ruling.

## 5. *Ineffective Assistance of Counsel*

■ Wembley contends that his defense counsel ineffectively assisted him when she failed to object to Lashley's expert testimony. Much of Lashley's testimony was proper. As we have discussed above, only the credibility assessment was improper and objectionable.

■ A claim of ineffective assistance of counsel is established when it is shown that the attorney's performance fell below an objective standard of reasonableness and, but for this deficiency, there is a reasonable probability that the outcome of the case would have been different. *Gates v. State*, 398 N.W.2d 558, 561 (Minn.1987).

The state contends that defense counsel refrained from objecting to Lashley's testimony as a matter of strategy. Given the clear, and nearly absolute, rule that an expert witness is not permitted to give an "assessment" of another witness's credibility, we cannot conceive of any strategic reason for failing to object to Lashley's "assessment" testimony. But as we have

stated above, Lashley provided very little that the jury could not discern for itself from both the videotaped interview and K.C.'s trial testimony. The jury could determine all of the factors that Lashley based her assessment on, and thus it is likely that Lashley's influence in the trial was minimal. Even had defense counsel objected and succeeded in obtaining the exclusion of Lashley's improper assessment testimony, very little for jury consideration would have been lost, and we are convinced that the outcome of the case would not have been different. Wembley has failed to establish his claim of ineffective assistance of counsel.

## 6. *Wembley's Pro Se Issues*

Wembley raises two issues in his pro se brief: (1) whether counsel was ineffective by not presenting any of Wembley's witnesses or by not doing "any form of investigations into the alleged allegations", and (2) whether counsel allowed tainted, suggestive evidence into trial.

■ An assignment of error in a brief based on "mere assertion" and not supported by argument or authority is waived unless prejudicial error is obvious on mere inspection. *State v. Modern Recycling, Inc.*, 558 N.W.2d 770, 772 (Minn.App.1997). Wembley makes mere assertions of error without supporting facts, authorities, or arguments. He contends that his trial counsel did not do any investigation or prepare a proper defense by calling witnesses on his behalf. But he fails to cite any facts indicating that counsel did not investigate the case, and he fails to identify potential witnesses and their likely testimony, if presented. He also fails to show that, but for the alleged errors, the jury verdict would have been different. *See Gates*, 398 N.W.2d at 561 (requiring a showing that, but for the error of counsel, the outcome would have been different).

Wembley next argues that the state's witnesses agreed "that a lot of suggestive questions were asked of the victim" and that these witnesses stated "there is a big problem with suggestive questions." Yet Wembley does not cite any place in the record showing "suggestive" questioning of witnesses. Nor does he show that "but for" the alleged suggestive questioning, the verdict would have been different.

## DECISION

A defendant does not have a constitutional right to be present during jury deliberations when the jury reviewed exhibits submitted into evidence. Therefore, the district court did not commit reversible error when it allowed the jury to replay the videotape exhibit outside of Wembley's presence. Although an expert may not testify to a witness's credibility, such testimony is not necessarily prejudicial when the witness has testified and the jury could judge for itself all of the factors on which the expert relied in making a credibility assessment. When a party-declarant offers an out-of-court statement in its favor, it is self-serving hearsay and inadmissible unless counsel identifies a relevant non-hearsay purpose for the statement or unless such a purpose is readily apparent.

**Affirmed.**